

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

MICHAEL A. TREADWAY, LINDA GENTRY
and JUDITH ALLEN SULLIVAN
### PLAINTIFFS

**VERSUS**

TERRY LISOTTA, PROPERTY INSURANCE
ASSOCIATION OF LOUISIANA (PIAL),
LOUISIANA CITIZENS PROPERTY INSURANCE
CORPORATION (Citizens) , CHAD BROWN,
JEFF ALBRIGHT, CARYL MATHES, MIKE ELY,
JOELLE LAPREZE, HAL STIEL, CHRISTIAN
FASER III, P&C INSURANCE CONSULTING,LLC
AND VARIOUS ATTORNEYS IDENTIFIED
AT THIS TIME AS "JOHN DOES"
### DEFENDANTS

CIVIL ACTION 08-1375

SECTION SECT.F MAG 5

MAGISTRATE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### *RICO COMPLAINT AND DEMAND FOR JURY TRIAL*

NOW INTO COURT, through undersigned counsel, come Michael A. Treadway, a

policyholder of Louisiana Citizens Property Insurance Corporation, Linda Gentry, a

policyholder of Louisiana Citizens Property Insurance Corporation, who has settled her

"Katrina claim"and Judith Allen Sullivan, an insured of USAA, who was forced to pay a

"recoupment" to USAA, which in fact was a Citizens' assessment passed on by her insurer

to her for payment, with all plaintiffs being residents of the Eastern District of Louisiana

and of the age of majority, who respectfully represent as follows:

1

**1.**

This court has jurisdiction over the claims and matters asserted herein pursuant to 28 U.S.C. § 1331, as plaintiffs' claims arise under the laws of the United States, specifically 18 U.S.C. § 1961, et seq., the RICO Act.

**2.**

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events given rise to the claims occurred in the Eastern District of Louisiana and defendant "Citizens" has its corporate offices in Jefferson Parish, Louisiana, which is found in the Eastern District of Louisiana.

**3.**

Made defendants are: (1) **Terry Lisotta**, CEO of Property Insurance Association of Louisiana (PIAL), and former CEO of Louisiana Citizens Property Insurance Corporation (hereinafter "Citizens" ); (2) **Chad Brown**, former  Chairman of the Board of Citizens and Deputy Commissioner of Insurance; (3) **Jeff Albright**, a member of the PIAL and Citizens Board of Directors, at all times relevant to these proceedings; (4) **Caryl Mathes**, CPA who was the former chief operating officer and acting financial officer for Citizens at all times relevant to these proceedings; **(5) Mike Ely**, Chairman of PIAL; (6) **Joelle Lapreze**, a member of the PIAL Board of Directors and the Citizens Board of Directors at all times relevant to these proceedings; (7) **Hal Steil**, a member of the PIAL Board of Directors and the Citizens Board of Directors at all times relevant to these proceedings; (8) **Christian**

2

Faser III, sole owner of (9) **P&C Insurance Consulting, LLC** (P&C) at all times relevant to these proceedings; (10) **PIAL** in its corporate capacity; (11) **Citizens** in its corporate capacity; (12)  and various attorneys and vendors with service contracts, identified at this time as "John Does."

## FACTUAL BACKGROUND

### 4.

Plaintiffs are insureds of Citizens or individuals, who were forced to pay "assessments" or "recoupments" on their non-Citizens' insurance contracts due to their insurer (other than Citizens) passing on to them the "recoupment" of "assessments" that their insurer was assessed with for the benefit of Citizens, with Citizens, at all times relevant to this dispute, under the control of defendants, Terry Lisotta, Chad Brown, PIAL, Christian Faser III, and P&C Insurance Consulting, LLC, as well as the other named defendants. Plaintiffs note that Robert Wooley, Louisiana Insurance Commissioner at these pertinent times, was , by statute, a member of the Citizens' board also.

### 5.

PIAL, underline defendant, underline was created in 1888 with changes over the years and by 1960 the association's purpose was to establish and regulate fire insurance rates in the State of Louisiana with underline every property insurer required to be a member of PIAL underline. PIAL is governed by a seventeen (17) member board with the Insurance Commissioner, plus two of his delegates servicing as members of the PIAL Board. Other than the Louisiana Senate and Louisiana House Insurance Committee Chairpersons, the remainder of the PIAL Board is

composed of representatives of the insurance industry.

In the past, when the Louisiana Legislature had established schemes similar to Citizens, such as the Costal Plan [1] and the FAIR Plan [2], PIAL "ran" both plans, which acted more or less as an "assigned risk pool". [3] On December 29, 2003 PIAL passed a resolution to enter into a contract with Citizens with PIAL acting as a third-party administrator (TPA) of the "new" Costal and FAIR insurance plans, now under the control of Citizens, which had no employees whatsoever. The TPA agreement begin on January 1, 2004 and was to end on December 31, 2004. The controlling part of the contract reads "PIAL shall perform for Citizens , on a cost and expense reimbursement basis, without profit, commission or fees to PIAL, such services as may be required to operate and administer the Citizens Fair and Costal Plan programs pursuant to Citizens' Plan of Operation, as it may be amended." PIAL continued as the Citizens' TPA at least until May 23, 2007 [4], even though Citizens had not renewed or signed another contract with PIAL since the expiration of the December 31, 2006 agreement. During this period, PIAL collected the following amounts from Citizens:

1.    December 31, 2004- **$1,532,972.00**

---

[1] 1970

[2] 1992

[3] Unlike Citizens, these plans involved the participation of insurance companies who were members of PIAL.

[4] Plaintiffs say even Citizens' own records are not clear as to when PIAL released its control of Citizens.

4

2.    December 31, 2005-**$7,631,554.00**

3.    December 31, 2006-**$11,607,305.00**

with individual Board Members of PIAL also serving on the Citizens' board and with Citizens and PIAL sharing the same General Counsel. PIAL had contracts with three service vendors, P&C Insurance Consulting, LLC, and two law firms with two of the service providers whose charges were allocated to Citizens having no written contracts signed by both parties. Citizens reimbursed PIAL $296,094.00 for professional services fees yet PIAL could not document the services provided for $187,344.00 paid to two vendors. PIAL billed and collected from Citizens for "some expenses that were either not Citizens' expenses or do not appear to be necessary and reasonable expenses necessary to conduct Citizens' business, such as hunting and fishing trips and contract fees."[5]

6.

**Terry Lisotta,** <u>defendant,</u> w as the CEO of Property Insurance Association of Louisiana (PIAL), and former CEO of Louisiana Citizens Property Insurance Corporation (Citizens), holding both positions at the same time. Mr. Lisotta admits that some "service providers" have no "written contracts" with PIAL. [6] Even with this admission, PIAL billed Citizens for the period of January 2004 through December 2006 for $102,750.00 for one of these "service providers" and $2,585.00 for his expenses, with Citizens paying same without supporting documentation. Under Mr. Lisotta's tenure as CEO of PIAL and

---

[5]  Office of Legislative Auditor, May 23, 2007, Page 3.

[6]  Office of Legislative Auditor, May 23, 2007, Page 11.

5

Citizens, during the period from August 29, 2005 through June 30, 2007, "Citizens paid an estimated $3.5 million to $3.7 million in claims-related legal expenses."[7]   Under Mr. Lisotta's reign at PIAL and Citizens' through its TPA agreement, the following acts occurred, pursuant to the Louisiana Legislative Auditor:

A. "Citizens had verbal agreements with seven law firms to defend Citizens in lawsuits."

B. "Citizens does not have written contracts with the law firm it uses to provide legal defense in claims litigation."

C. "Citizens and its service providers have not entered initial reserves into Citizen's computer system in a regular or consistent manner." (Thus Citizens could not properly post its reserves as required by state law, as an insurer.)

D. "Citizens does not have an adequate system to ensure that it is getting the best results from its attorneys."

E. "We identified two situations related to Citizens' hiring of law firms that may need to be reviewed by the Louisiana Board of Ethics."

F. "Citizens did not use a formal process to select its defense attorneys or set attorneys' fees."

G. "We noted inconsistent billing practices among the attorneys, as well as inconsistencies in what supporting documentation the attorneys provided with their invoices."

---

[7]   Office of Legislative Auditor, December 5, 2007, First Page "Report Highlights".

**H.**" Citizens has not accounted for its reserves regularly or consistently, thus the reserve balances needed for Citizens' management reports are not reliable."(Thus Citizens can not, pursuant to law, demonstrate an adequate picture of its financial standing during the time it **borrowed $978, 205,000.00** by selling bonds .) "As a result, the reserve balances needed for Citizens' management reports are not reliable."[8]

**I.** "In most cases, [Citizens'] policyholders report claims directly to their insurance agents. The agents enter the claims into the Louisiana Plans Management System (LPMS), Citizens' electronic policy management system, to which three of Citizens' service providers have online access. The agents then forward the claims files to the designees at the appropriate service provider for review. The service providers then assign the claims to adjusters based on the complexity of the claims and the individual adjusters' level of experience." ".....LPMS does not contain reliable summary financial data."[9]

**J.** The former CEO of Citizens [Terry Lisotta] selected the attorneys based on the geographic location of the claims and **on social, professional, or commercial relationships the firms had with him** and/or Citizens' general counsel."

**K.** Although it may not be standard practice [10]in the insurance industry to use

---

[8]   Office of Legislative Auditor, December 5, 2007,  Page 4.

[9]   Office of Legislative Auditor, December 5, 2007, Page 6.

[10] The Legislative Auditor  was relying on a representation of Citizens' counsel.

written contracts with law firms, <u>Citizens is an entity of the state</u>." (Plaintiffs disagree with the assertion that insurance companies do not engage in written agreements with their counsel, with plaintiffs further suggesting that the *Rules of Professional Responsibility* require a written agreement between an attorney and his client.)

**L.** " Citizens and its service providers have not entered initial reserves into Citizens' computer system in a regular or consistent manner."

**M.** " Because neither Citizens' staff nor service providers have consistently established and adjusted reserves, Citizens has not been able to report reliable reserve balances on its management reports or financial statements."

### 7.

### MR. LISOTTA'S CONVERSION OF CITIZENS' FUNDS
### OF A PERSONAL NATURE

**A.**"PIAL, Citizens and LAIP[11] had a combined total of **$1,040,731.00 in travel, meals, and entertainment expenses.** Mr. Lisotta was reimbursed and/or spent approximately $264,245[00] for expenses he reported to have incurred. We examined specific transactions totaling $25, 702[00] or 105 of his expenditures. These transactions indicate that **Mr. Lisotta was reimbursed for expenses he did not incur,** expenses that did not have a legitimate public purpose, and expenses that were personal expenditures. Mr. Lisotta would not confirm the specific

---

[11] **Louisiana Auto Insurance Plan,** a PIAL controlled entity, with no relationship to Citizens, which, as seen below, Citizens was billed for some of its costs.

circumstances of the expenditures."[12]

B. "We did not examine the remaining $238,543[00] of Mr. Lisotta's expenditures to determine whether there was a legitimate business purpose."

C. "Bonuses, totaling $180,299[00] were paid by PIAL to senior management and other employees in violation of the Louisiana State Constitution."[13]

D. "As of this date[ September 26, 2007] Citizens has paid PIAL $1,248,351[00] for equipment, however, PIAL has not transferred ownership of these assets to Citizens."

E. "Mr. Lisotta could not satisfactorily explain the valid business purposes for the expenditures or the allocations of his expenditures to the three agencies. In addition, it appears that Mr. Lisotta [CEO of PIAL & Citizens] personally benefitted from some of the transactions."

F." From February 4, 2005 through February 8, 2005 (Marti Gras season), Mr. Lisotta incurred charges totaling $1,716.56 on his LAIP credit card for two rooms at the Avenue Plaza Hotel in New Orleans. Mr. Lisotta thereafter submitted an expense report that listed a personal cash expenditure of $ 914.77 for one room for a 4 ½ day stay at the Avenue Plaza Hotel for the same February time period."[14]

G. "On February 26, 2004, Mr. Lisotta and Mr. Chris Faser, Citizens board chairman,

---

[12]   Office of Legislative Auditor, September 26, 2007, Page 3.

[13]   Office of Legislative Auditor, September 26, 2007, Page 3.

[14]   Office of Legislative Auditor, September 26, 2007, Page 8.

9

departed for Europe for re-insurance business **via New York and Bermuda**. On February 10, 2004, Mr. Lisotta purchased airline tickets for his wife, Sandra D. Lisotta, to travel with him to New York and Bermuda. Mrs. Lisotta's airfare to and from New York and Bermuda cost a total of $1,219.75, all of which was charged by Mr. Lisotta to his LAIP credit card. There is no record of Mr. Lisotta reimbursing LAIP for the cost of his wife's airfare on this trip. "[15]

H. Plaintiffs say that apparently very little PIAL work on behalf of Citizens could have been accomplished as the record is ripe with expensive cigar purchases, other airline tickets for Mr. Lisotta's daughters, LSU football season tickets, an LSU parking pass, $1,723.00 for the purchase of "golf merchandise", purchase of golf games, [ Mr. Chad Brown] was listed as participating, **spa treatments for Mr. Ruiz** and **Mr. David Steil**, a Citizens board member in Point Clear, Alabama, quail hunts in Ville Platte, Louisiana, with the Louisiana Legislative Auditor declaring that of Mr. Lisotta's expenditures examined, $25, 702.00 "appears to be expenses that Mr. Lisotta either did not incur, were personal in nature, or did not have a legitimate public purpose."

**8.**

Plaintiffs say that as Mr. Lisotta was the CEO of PIAL, which held a TPA agreement to manage Citizens', that Lisotta, with co-defendants, who at all times had a fiduciary duty to plaintiffs acted in a manner that can only be considered a conspiracy and for the exclusive

---

[15]   Office of Legislative Auditor, September 26, 2007, Page 9.

benefit of the participants. Plaintiffs say that the above action easily state a civil claim under the *Racketeer Influenced and Corrupt Organizations Act* (RICO), and that plaintiffs will show that the defendants violated the *Act*, and that the plaintiffs were injured as a result of the violations, in particular excessive insurance premiums, breach of fiduciary duty, loss of revenue to their insurer, Citizens, and further, those individuals who are cast with "recoupment costs" through non-Citizens insurers were damaged in being forced to become unwilling surety for almost one billion dollars in bonds that Citizens borrowed.

### 9.

**Caryl Mathes**, CPA , <u>defendant,</u> who was chief operating officer and acting financial officer for Citizens at all times relevant to these proceedings "was given severance pay totaling $47,850.[00] in violation of the Louisiana Constitution."[16] **Mathes**, a CPA , was chief operating officer and acting financial officer for Citizens at all times relevant to these proceedings, and in this position was a willing participant in the scheme as outlined in these pleadings.

### 10.

**Chad Brown**, <u>defendant,</u> former Chairman of the Board of Citizens and Deputy Commissioner of Insurance , as well as "Chairman" of the Louisiana Insurance Rating Commission, was in the position of being able to stop the actions of Lisotta and Faser, but took no steps to do so, on information and belief, becoming a participant in the scheme, as will be shown at the trial of this matter.

---

[16]  Office of Legislative Auditor, September 26, 2007, Page 9

**11.**

**Jeff Albright,** <u>defendant,</u> a member of the PIAL and Citizens Board of Directors, at all times relevant to these proceedings, was in the position of being able to stop the actions of Lisotta and Faser, but took no steps to do so, on information and belief, becoming a participant in the scheme, as will be shown at the trial of this matter.

**12.**

**Mike Ely,** <u>defendant,</u> Chairman of PIAL, at all times relevant to these proceedings, was in the position of being able to stop the actions of Lisotta and Faser, but took no steps to do so, on information and belief, becoming a participant in the scheme, as will be shown at the trial of this matter, with PIAL receiving in excess of **$ 20,771,831.00** from Citizens and to the detriment of Citizens and those it insured, as well as those individuals cast with "recoupment payments.".

**13.**

**Joelle Lapreze,** <u>defendant,</u> a member of the PIAL Board of Directors and the Citizens Board of Directors at all times relevant to these proceedings was in the position of being able to stop the actions of Lisotta and Faser, but took no steps to do so, on information and belief, becoming a participant in the scheme, as will be shown at the trial of this matter, with PIAL receiving in excess of $ 20,771,831.00 from Citizens and to the detriment of Citizens and those it insured.

**14.**

**Hal Steil,** a member of the PIAL Board of Directors and the Citizens Board of

Directors at all times relevant to these proceedings was in the position of being able to stop the actions of Lisotta and Faser, but took no steps to do so, on information and belief, becoming a participant in the scheme, as will be shown at the trial of this matter.

**15.**

**P&C Insurance Consulting, LLC** defendant and **Christian Faser III**, defendant, were employed by PIAL on April 1, 2004 to perform services such as "attending meetings", "availability for consultation" and consultation for regulatory matters on behalf of PIAL and Citizens. Mr. Faser was a former deputy commissioner of insurance of the Louisiana Department of Insurance (DOI). P&C was to be paid $5,000.00 per month plus reasonable expenses for travel, food, and lodging. Its contract expired in March 2005, but PIAL continued its relationship with P&C, without a contract to at least May 23, 2007. With no supporting documentation, **P&C was paid $192,336.00 for fees** and expenses by PIAL from April 2004 to December 2006, with **PIAL invoicing $102,062.00 of this amount to Citizens**, citing its "administrative contract" with Citizens, with PIAL **unable to demonstrate** as to what the $102,062.00 was for. PIAL also allocated to Citizens, on behalf of Mr. Faser and P&C, **$5,901.00 of retainer fees paid to the Louisiana Auto Insurance Plan (LAIP)**, which is unexplainable as Citizens had no conceivable relationship with LAIP. Thus movers assert that PIAL, as will be further shown below, and at the trial of this matter, assessed as part of the alleged conspiracy, any amounts they wished to Citizens, and without reason or cause or supporting documents. Subject to the opinion of the Louisiana Legislative Auditor,

Mr. Faser "may have violated Louisiana law", pursuant to *R.S. 42§1121.*[17] Of interest, Mr. Faser asserts "that at least 90% of the work he performed was on behalf of PIAL and **was not related to Citizens.**"[18] Mr. Faser asserts that "all his reports were oral and were presented to the PIAL board and that he did not keep any personal records to document the work he performed in fulfillment of this contract."[19]

### 16.

Plaintiffs suggest that Mr. Faser and P&C breached their duties to movers, participating in a scheme to enrich themselves, as well as the co-conspirators, with Mr. Faser and P&C specifically engaging in the following acts:

1.  On April 1, 2004, P&C Consulting, LLC, submitted and received $27,336.00 of expense reimbursements through December 31, 2006 for mileage, lodging, meals, tips, parking, and hunting and fishing trips.

2.  P&C submitted and received $7,043.00 in reimbursement for eight hunting trips Mr. Faser arranged and attended at the Bon Amis Hunting Club in Ville Platte, Louisiana, submitting same to co-defendant, PIAL, with PIAL invoicing co-defendant Citizens for $3,522.00 of the expenses with Mr. Faser identifying the "guests" as co-defendant, **Chad Brown**, Chairman of the

---

[17] A former agency head (DOI) cannot, for a period of two years from his termination of employment, with brevity, enter into an agreement for compensation involving the same agency (DOI).

[18] Office of Legislative Auditor, May 23, 2007, Page 6.

[19] Office of Legislative Auditor, May 23, 2007, Page 6.

Citizens Board and deputy commissioner of insurance, as well as a PIAL

board member; **Robert Wooley**, Louisiana Commissioner of Insurance at the

time; **Steven Ruiz**, a PIAL board member, as well as a board member of the

Louisiana Insurance Rating Commission; **Kip Wall**, a former employee of the

Louisiana Department of Insurance and at the time CEO of the Office of

Group Benefits for the State of Louisiana; and **Steve Cavanaugh**,[20] a former

director of the Louisiana Workers' Compensation Corporation.

3.    Mr. Faser says that none of the foregoing guests paid for their portion of the

hunting trip and that he incurred all of the expenses and that PIAL never

questioned his expense report for the eight hunting trips, and further that

PIAL never questioned him about any of P&C's expense reports to PIAL.

4.    Mr. Faser and P&C submitted and received $1,020.00 from PIAL for an

October 2004 fishing trip for the benefit of **Mr. Faser**, **Steven Ruiz**, **Joe**

**Godchaux**, and **Jabari Ragas**, all members of the Louisiana Insurance Rating

Commission. In turn, PIAL **billed Citizens for 100% of these expenses** which

included $170 for food and alcohol purchased at Winn-Dixie and $140.00 for

Mr. Faser's milage. Plaintiffs are unaware of what relationship such

"expenses" had to their contracts of insurance with Citizens.

5.    **Robert Wooley, Steven Ruiz, Jabari Ragas and Chad Brown** all held

positions at regulatory agencies at the time they attended the foregoing

---

[20] Mr. Cavanaugh is now deceased.

hunting and fishing trips, with the Louisiana Legislative Auditor asserting that they "may have violated Louisiana law by accepting gifts from Mr. Faser [21], who then billed co-defendant, PIAL for the expenses, **with PIAL then passing the costs on to Citizens.**

### 17.

Citizens was created as a nonprofit corporation by *Act 1133* of the 2003 Regular Legislative Session, which enacted *LRS 22§1430* specifically to operate two residual market insurance programs, the "Costal Plan" and the "FAIR Plan" found above, with Citizens becoming the successors to the old plans. [22] Specifically the scheme creating Citizens, as found in the enabling legislation is to act as an"insurer of last resort", operating insurance plans functioning exclusively as an insurer "to applicants who are entitled to, but unable to procure coverage through the voluntary(i.e. private) market."[23] Thus the creation of Citizens had the effect of shifting all of the potential claims that would have occurred in the

---

[21] *R.S. 42§1115*

[22] While the insurance companies who are members of PIAL participated in underwriting the "Costal Plan" and the "FAIR Plan", with the arrival of Citizens, property insurers who are members of PIAL no longer had that obligation. In other words Citizens' income comes solely from premiums obtained from its insureds and assessments. Interestingly, these assessments may be obtained from Citizens' policyholders as well as every insurer in the State of Louisiana who sells fire, allied lines, homeowners' multi peril, and the property insurance portion of commercial multi peril policies, as well as mobile homes policies who, when an assessment is determined, are billed by the Department of Insurance (DOI) with the insurer then passing the assessment own to its insured as a "recoupment." Thus every insurance company in Louisiana, meeting the above protocol, is subject to an assessment, and passes it to its policyholder as a "recoupment." The fact that the "insured" is not a "Citizens' policyholder" has no bearing on the matter, whatsoever.

[23] Office of Legislative Auditor, December 6, 2006, Page 3.

"Costal Plan" and the "FAIR Plan" from the private insurance market to the citizens of Louisiana who purchased property insurance and the insureds of Citizens, who paid premiums. In effect, the insureds of Citizens are paying their own claims out of their premiums, assisted by the assessments "recoupment"collected from the private insurers, who then pass the "recoupment" back to their insureds, as well as the proceeds of the almost **One billion dollars** borrowed by Citizens, in their name.

### 18.

LSA 22§1430.3(A) established a fifteen (15) member board of directors for Citizens, tasking the Board with adopting a plan of operation, as well as requiring the Louisiana House and Senate Insurance Committees to approve the plan of operation and all revisions. Citizens' rates on residential insurance contracts were required to be at least ten (10) percent higher than the rates charged "to the insurers with the greatest total direct wrote premium (DWP) in each parish for that line of business in the preceding year.[24] "State law also allows Citizens to levy an emergency assessment on all assessable insureds when its board of directors determines that the corporation faces a deficit in either the Costal or Fair Plan." [25] Regardless, even with this "over-site", Terry Lisotta, as CEO of Citizens and Chad Brown as Chairman of the Board of Citizens, with the apparent complicity of the "Citizens" Board,

---

[24] Even the casual observer easily sees that Citizens, due to its excessive cost, would only be purchased when the "private insurers"declined the risk. Additionally, Citizens could never compete with the "private insurers" due to its build-in ,excessive cost factor, and the "private insurer" could sell the Citizens' policy itself, through its producers, who received the standard commission. Thus plaintiffs assert that Citizens could never compete with an "admitted insurer" and in fact would relieve these insurers of having to participate in "assigned -risk" plans.

[25] Office of Legislative Auditor, December 6, 2006, Page 6.

17

with PIAL acting as TPA, and with the concurrence of numerous law firms, in April 2006, arranged for Citizens to borrow **$978, 205,000.00 by selling bonds** to help cover the deficit in the FAIR Plan. "The estimated annual debt service to repay the bonds is $50 million to $83 million. As currently structured, it will take Citizens 20 years to repay the bonds."[26] "Citizens pledged the proceeds of future emergency assessments to repay the bondholders."[27]

19.

Regardless, "state law says that the Citizens' insurance plans are not intended to offer competitive rates, but its rates must be actuarially justified [28]and must be adjusted annually."[29] [30] Further, Citizens' "Plan of Operations"[31] defines *"Plan Deficit" [as] means the amount by which the negative Operating Result for a plan year exceeds all accumulated profits and excess reserves over and above reasonably anticipated recurring operating costs. A negative Operation Result is determined by applying the total of all General Expenses, Debt Service Expenses, and Incurred Losses for that plan year against the Total Revenue for the plan year as determined in*

---

[26] Office of Legislative Auditor, December 6, 2006, Page 2.

[27] Office of Legislative Auditor, December 6, 2006, Page 2.

[28] As far as plaintiffs have been informed, Citizens has no actuary, which is required by law.

[29] Office of Legislative Auditor, December 6, 2006, Page 3.

[30] The statute was amended numerous times, none of value in this complaint, other than the 2006 Regular Session were "wind and hail coverage" was removed from the ten (10) percent provision until January 1, 2009.

[31] Dated December 2, 2003.

*conformity with the accounting practices prescribed or permitted by the Department of Insurance of the State of Louisiana."*[32] Thus, considering its own definition, and as plaintiffs will show at the trial of this dispute, defendants were never solvent and in fact went to great lengths to assure the policyholders of Citizens, at all times under the control of PIAL, that it was solvent, thus making it more likely than not, that it would fail.

**20.**

Citizens is/was required to develop and annually reassess a reasonable and prudent reinsurance program. [33] At <u>Section 26</u> [34], regarding "Reinsurance" "*[T]he Corporation may purchase reinsurance on risks insured by the Plans in accordance with a reasonable and prudent reinsurance program. The reinsurance **shall be purchased for the benefit of the policyholders** of the Plans and shall enhance the capability of the Corporation to timely and **efficiently process claims from Plan policyholders resulting from a hurricane or other natural disaster**.*" Plaintiffs suggest that the failure of defendants to have followed the foregoing in a reasonable and prudent fashion was part of the conspiracy that will be shown at the trial of this dispute.[35]

**21.**

Citizens may dissolve the "Costal Plan" and the FAIR plan when less than 1,000 policies are written in a plan year. "The Citizens legislation provides for the depopulation of

---

[32] Page 5 of Citizens' Operating Agreement.

[33] Office of Legislative Auditor, December 6, 2006, Page 3.

[34] Page 27 of Citizens' Operating Agreement.

[35] Plaintiffs have yet to establish that Citizens has received any re-insurance payments for the recent hurricanes.

the Costal and FAIR plans."[36] On July 1, 2006 , Citizens levied a 15 percent "market equalization charge" **on its own policyholders,** and continued to do so until June 30, 2007, which it is allowed to do after implementing of a "regular assessment" on non-Citizen customers, thus always maintaining a higher rate than "admitted, non-Citizens' insurers." Thus the payment of an "assessment" to a non-Citizens' insurer, which is then passed back to Citizens, makes the non-Citizens' insureds a surety for the debts of Citizens when they have no relationship at all with Citizens other than the provisions of law that created "Citizens". The Citizens' "market equalization charge" that ended on June 30, 2007 raised about $30,375,000.00 for Citizens, yet Citizens still had to borrow **$978,205,000.00** through bonds to cover deficits, which plaintiffs will be forced to pay.

## 22.

Considering the foregoing, on December 29, 2003 , Terry Lissota, PIAL , Christopher Faser III, and P&C commenced a scheme whereby false, excessive, inflated , and improper expenses were charged to Citizens, with defendants creating invoices for services and work which was not allowed by law and on information and belief, was not performed.

## 23.

The scheme devised and employed by defendants under the control of defendant Terry Lisotta, with the assistance of defendants, PIAL , Christopher Faser III, Chad Brown and P&C resulted in improper payments to be made to other entities whic h defendant Lisotta controlled or influenced, including numerous law firms, adjusting companies, insurance

---

[36] Office of Legislative Auditor, December 6, 2006, Page 4.

service providers as well as charging expenses against Citizens for the personal benefit of Terry Lisotta, PIAL, Christopher Faser III, Chad Brown, and others. The false charges, invoices and payments, cited above, resulted in defendants receiving money and benefits which they were not entitled to, thus decreasing the funds available to Citizens' policyholders as well as causing non-Citizens policyholders to be burdened with larger "assessments" through "recoupments" from their insurers.

## FIRST CAUSE OF ACTION
## RICO VIOLATION
### 24.

Plaintiffs *realledge* and *reavers* the allegations of paragraphs 1-24 as if copied herein *in extenso*.

### 25.

Plaintiffs will show that the PIAL "TPA" arrangement with Citizens is an enterprise which effects interstate commerce, as many acts of defendants, found herein, were undertaken in foreign and alien venues, with plaintiffs saying that defendants sold bonds in numerous, if not all states in this country, that defendants converted funds from Citizens in foreign and alien locations, thus plaintiffs say that the effect on interstate commerce is without question.

### 26.

Defendants, Terry Lisotta, PIAL, Christopher Faser III, P&C, Chad Brown, as well as the other named defendants are each RICO "persons" pursuant to *18 U.S.C. §1961(3)*. Each of the defendants has been conducting business through a pattern of racketeering activity, and each participated in the conduct of the affairs of the RICO enterprise, specifically the

association in fact comprising the entities and individuals which jointly control the Citizens' entity and are the legal proximate cause of injuries and damages to plaintiffs as set forth herein.

### 27.

The predicate acts engaged in by defendants, which comprise a pattern of racketeering activity are as follow:

### WIRE AND MAIL FRAUD

1. Defendant **Terry Lisotta**, operating with and through PIAL, **Christopher Faser III, P&C, Chad Brown** and various other individuals not named as defendants herein, orchestrated a scheme to charge expenses against Citizens for services and payments which were not actually performed and which defendants knew and should have known were not reasonable or justified under the circumstances, which scheme to defraud plaintiffs was carried out through the use of the United States Mails and Wires in violation of *18 U.S.C. §§1341, 1343*. On information and belief the individual uses of the United States Mails and Wires consisted of numerous acts for the common purpose of carrying out the fraudulent scheme;

2. The scheme to defraud plaintiffs and other insureds of Citizens, as well as the insureds of other insurance companies who passed Citizens' "assessments" on to their policyholders was executed by obtaining funds and submitting fraudulent invoicing by wire and the Unites States Mail in interstate commerce.

In response to these invoices, payments were made by wire and mail to defendants' **Terry Lisotta, PIAL, Christopher Faser III, P&C,** with other defendants, named above, also the recipient of payments or services being completed upon the payment of each individual fraudulent invoice orchestrated by **Terry Lisotta, PIAL** and other defendants.

3.   Defendants have affirmed in numerous public statements and statements under oath as to the financial solvency of Citizens while at the same time engaging in the dissemination of false statements, failing to present any financial statements to show valid operating charges and expenses, and using the United States Mail in such dissimilation.

4.   Defendants, **Terry Lisotta, PIAL, Christopher Faser, III, P&C and Chad Brown,** in violation of the Citizens "Operating Manuel" breached their duty to acquire adequate reinsurance, violating their fiduciary duty to Citizens, as well as the laws of the State of Louisiana.

5.   Defendants, **Terry Lisotta, PIAL, Christopher Faser, III, P&C and Chad Brown,** in violation of the Citizens "Operating Manuel" and the laws of the State of Louisiana, breached their duty to provide quarterly and annual reports of the financial status of Citizens, and even as of the date of the filing of this complaint, have not done so with defendants conducting the business of Citizens through a pattern of racketeering activity, with each participating in the conduct of the affairs of the RICO enterprise, specifically their association

in comprising the entities and individuals, through this scheme, as well as using their control of the Citizens' entity for their benefit and the benefit of others, and therefore are the legal proximate cause of injuries and damages to plaintiffs as set forth herein.

6. Defendants, **Terry Lisotta, PIAL, Christopher Faser, III, P&C and Chad Brown's** failure to provide an accounting for Citizens was rendered with the specific intent to deprive Plaintiffs and other insureds of the proper use of their premiums and assessments, as well as to conceal their improper payments or services/benefits for their personal use.

7. Plaintiffs say that due to the action/inaction of Defendants, **Terry Lisotta, PIAL, Christopher Faser, III, P&C and Chad Brown,** plaintiffs ha ve no accounting/financial records that are true or accurate for Citizens, and with which Defendants were entrusted.

8. Defendants fraudulent scheme to charge for services and expenses against the revenue of Citizens was accomplished by false invoicing and false accounting to the public, with plaintiffs being led to believe that Citizens was solvent, which scheme to defraud plaintiffs was carried out through the use of the United States Mails and Wires in violation of *18 U.S.C. §§1341, 1342,* constitutes a pattern of racketeering activity under *18 U.S.C. §1961(1);*

## MONEY LAUNDERING

9. Defendants have engaged in Money Laundering in violation of *18 U.S.C.*

§§1956(a)(1)(A)(1)(I) and 1956(a)(1)(B)(I), with full knowledge that monetary transactions involving the proceeds of felonious activity ( the ill-gotten gains from the racketeering scheme alleged herein) did knowingly, intentionally and willfully conduct and cause to be conducted numerous monetary transactions by financial institutions engaged in, and the activities of which effect, interstate and foreign commerce, with funds actually derived from the pattern of racketeering activity under 18 U.S.C. § 1961(1) [wire and mail fraud as an example], such as: (1) deposit of revenue generated by Citizens , which had been converted by **Terry Lisotta and Christian Faser III**; (2) payments by check and/or wire transfer of these deposited revenues from Citizens , between and among the defendants in payment of fraudulent invoices, which transactions concealed the true nature, source, origin and true ownership of the funds transferred;(3) further distribution of the ill-gotten gains from the defendants to associates, state regulatory employees and attorneys which distributions were "laundered" for the purpose of making the funds so transferred appear legitimate, thus concealing the fact that said funds were ill-gotten gains derived from the pattern of racketeering activity detailed herein and promoting the racketeering enterprise by permitting the defendants to function and appear as legitimate individuals/entities; and (4) distributing funds by check and wire transfer to pay such items as "reimbursement for eight hunting trips", funds paid to **PIAL** from Citizens pursuant to the TPA agreement beginning on

25

January 1, 2004 , providing funds to P&C with no supporting documentation, with P&C receiving $192,336.00 for fees and expenses from **PIAL** from April 2004 to December 2006, with PIAL <u>then</u> invoicing $102,062.00 of this amount to Citizens, citing its "administrative contract" with Citizens, payments of at least $20,771,831.00 to PIAL from December 31, 2004 through December 31, 2006, as well as payments in the amount of $1,020.00 from PIAL for an October 2004 fishing trip for the benefit of **Mr. Faser, Steven Ruiz, Joe Godchaux,** and **Jabari Ragas,** all members of the Louisiana Insurance Rating Commission, PIAL also allocated to Citizens, on behalf of Mr. Faser and P&C, $5,901.00 of retainer fees paid to the Louisiana Auto Insurance Plan (LAIP), **which has no relationship to its TPA agreement with Citizens,** all of the foregoing examples entered into by defendants in order to maintain an appearance of legitimacy and promote the racketeering enterprise, all of which distributions were "laundered" for the purpose of making the transferred funds appear legitimate, thus concealing the pattern of racketeering activity detailed herein and further promoting the racketeering enterprise.

10.    Defendants conducted or caused to be conducted each and every monetary transaction, as alleged above,[37] involving criminally derived property knowing in fact that the source of these funds was an unlawful racketeering scheme

---

[37] Plaintiffs rely on the reports of the Louisiana Legislative Auditor in many financial transactions cited.

26

(constituting specified unlawful activity within the meaning of *18 U.S.C. §1956 (c)(7)(A)*, with reference to *18 U.S.C. § 1961(1)* [wire and mail fraud] described herein.

11.     Each monetary transaction, described above, was performed with specific intent, to promote, carry on and further the pattern of racketeering activity described herein, including the use of funds to pay operating expenses of Citizens, claims, claims adjustors and attorneys in order to maintain an appearance of legitimacy for the corporate defendants, all essential to the RICO scheme.

12.     Each monetary transaction for payment to Christian Faser III, as well as the "expenses" of Terry Lisotta and "gifts" and "free services" received by others, including Louisiana Regulatory officials, were performed by defendants with specific intent to hide, conceal from plaintiffs and third parties, and disguise the nature, location, source ownership and control of the proceeds of the pattern of racketeering activity described herein.

28.

The wrongful conduct of defendants outlined above constitute a pattern of racketeering activity pursuant to *18 U.S.C. § 1961(5)*, as all such actions occurred within ten (10) years and are related and continuing. The pattern of racketeering activity constitutes a continuing open-ended pattern with an identical purpose, which is to defraud plaintiffs and the policyholders of other insurers who are subject to the "Citizens' assessment", as well as

fill the pockets of service providers, attorneys, and in particular fund the conversion of funds by Terry Lisotta, Christian Faser III, who at all times were in control of PIAL, and through PIAL and its TPA agreement to "run" Citizens", with said funds being converted to their personal use, used for the wrongful benefit of "entertainment" of Louisiana State regulatory officials, including members of the Louisiana Insurance Rating Commission and the Commissioner of Insurance at that time, that the method of commission (wire/mail fraud and money laundering) were interrelated by distinguishing acts and characteristics rather than isolated and *unrelated events.* This pattern of racketeering activity has existed for four (4) consecutive years beginning on January 1, 2004, and on information and belief continues to this day, thus posing long term constituted criminal activity. In fact, the policyholders of Citizens, as well as the "assessable insureds" of other insurers are the security for more than 989 million dollars in bonds, which they will pay on until 2027, with the "bonds" themselves being confected, and sold, on information and believe , by the direct advice of Terry Lisotta, Chad Brown and Christian Faser III.

**29.**

As a result of defendants' wrongful acts and violation of *18 U.S.C. §1962( c )* plaintiffs have already suffered damages and injuries, including increased insurance costs, failure to have their Citizens' insurance claims paid timely, conversion of funds and "special benefits" received by defendants, but paid for out of Citizens' funds, and being cast as the surety for 989 million dollars in bonds which they will have to pay for until 2027, all of the above, due to the wrongful acts of defendants, acting in concert.

28

**30.**

As a result of defendants' violation of the *RICO Act*, plaintiffs are entitled to treble damages, legal interest, and reasonable attorney's fees, all pursuant to *18 U.S.C. §1964( c )*.

## SECOND CAUSE OF ACTION
## ALTERNATIVE RICO ALLEGATIONS

**31.**

Plaintiffs reallege and reaver all of the allegations of paragraphs 1-30 as if copied herein *in extenso*, including the allegations relating to the pattern of racketeering, effect upon interstate commerce, predicate acts, RICO persons, and plaintiffs' damages, but not those allegations relating to the association in fact which constitutes the RICO enterprise in this dispute.

**32.**

As an alternative to the RICO enterprise described above, consisting of the associations in fact comprising the entities and individuals which "controlled" Citizens, plaintiffs allege that Terry Lisotta, Christian Faser III and Chad Brown are persons within the meaning of *18 U.S.C. § 1961 (3)* and the RICO enterprise pursuant to *18 U.S.C. § 1961 (4)* consists of the following corporate entities managed, operated and controlled by Terry Lisotta and Christian Faser III, in particular PIAL, P&C, and Citizens. (Chad Brown was Chairman of the Board of Citizens as well as Deputy Commissioner of Insurance at the time).

**33.**

As a result of defendants, Terry Lisotta, Christian Faser III and Chad Brown's, wrongful acts and violations of *18 U.S.C. §1962( c )*, plaintiffs have suffered damages and injuries, including increased insurance costs, failure to have their Citizens' insurance claims paid timely, conversion of funds and "special benefits" received by defendants, **but paid for out of Citizens' funds**, being cast as the surety for 989 million dollars in bonds which they will have to pay for until 2027, as well as these specific defendants have breached their duty to acquire reinsurance, pursuant to the Citizens "Operating Agreement", and all of the above, due to the wrongful acts of defendants, with defendants acting in concert. As detailed herein, defendants, Lisotta, Faser and Brown have directly and indirectly conducted and participated in the conduct of the racketeering enterprise, as found above, through the pattern of racketeering activity (wire/mail fraud and money laundering) alleged above, all in violation of *18 U.S.C. §1962( c )*.

**34.**

Plaintiffs reserve the right to amend these pleading for the purpose of a class action.

**35.**

Plaintiffs request trial by jury.

**WHEREFORE**, plaintiffs pray that after due proceedings had, that there be judgment herein in favor of plaintiffs and against defendants for all damages which plaintiffs have sustained as a result of the defendants' wrongful conduct, including treble damages, reasonable attorney's fees, all costs of this action, interest according to law, and for any

additional relief as the evidence may support or that equity and the cause may require.

Respectfully submitted,

BY:

**MADRO BANDARIES, PLC # 25339**
Post Office Box 56458
938 Lafayette Street, Suite 204
New Orleans, Louisiana 70156
(504) 218 - 4815
Email: _madro.att.net@gmail.com_

**GREGORY P. DI LEO, LSBA #4943**
**JENNIFER B. EAGAN, LSBA #19847**
300 Lafayette Street, Suite 101
New Orleans, LA 70130
Telephone:  (504) 522-3456
Fax: (504) 522-3888

**JEFFREY BERNIARD, LSBA #29088**
Berniard Law Firm
625 Baronne St.
New Orleans, LA 70113
Telephone: (504)527-6225
Fax: (504) 617-6300

**BERNARD L. CHARBONNET, JR.# 4050**
CHARBONNET LAW FIRM
One Canal Place
365 Canal Street, Ste. 1155
New Orleans, Louisiana 70130
(504) 561-0996
(504) 949-1001 (Facsimile)

**ATTORNEYS  FOR PLAINTIFFS**

31