```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


MICHAEL TREADWAY, LINDA GENTRY              CIVIL ACTION
AND JUDITH ALLEN SULLIVAN


VERSUS                                      NO. 08-1375


TERRY LISOTTA, PROPERTY INSURANCE           SECTION "F"
ASSOCIATION OF LOUISIANA, LOUISIANA
CITIZENS PROPERTY INSURANCE CORPORATION,
CHAD BROWN, JEFF ALBRIGHT, CARYL MATHES,
MIKE ELY, JOELLE LAPREZE, HAL STIEL,
CHRISTIAN FASER, AND P&C INSURANCE
CONSULTING, LLC
```

ORDER AND REASONS

The plaintiffs in this lawsuit are three Louisiana property owners who seek damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, in relation to insurance assessments they paid to fund the operations of Louisiana Citizens Property Insurance Corporation (Citizens). The plaintiffs filed this RICO complaint against Citizens, Property Insurance Association of Louisiana (PIAL), Terry Lisotta (the former CEO of Citizens and PIAL), and seven other individuals associated with Citizens and PIAL, claiming that the defendants devised a scheme to

1

cause Citizens to pay for false, excessive, or improper business expenses between 2004 and 2007, which were ultimately passed on to Louisiana property owners through higher insurance rates and surcharges. Now before the Court is the defendants' motion to dismiss.[1] For the reasons that follow, the motion to dismiss is GRANTED.

### Background

Citizens was created by the Louisiana legislature in 2003 to oversee the state's Coastal and FAIR (Fair Access to Insurance Requirements) Insurance Plans. See La. R.S. 22:1430.2.[2] This state-run entity provides insurance to "high risk" applicants who may have difficulty obtaining coverage in the private market. By law, Citizens is governed by a 15-member board of directors that includes representatives from the Department of Insurance and Department of the Treasury, members of the House and Senate Committees on Insurance, people appointed by the governor, and members of various insurance associations. See La. R.S. 22:1430.3.

Citizens' funding comes from four sources. The first, is premiums paid by FAIR and Costal Plan policyholders. As insurance

---

[1] Citizens' filed a motion to dismiss joined by Chad Brown, Jeffrey Albright, David Stiel, Christian Faser, and P&C Insurance Consulting, LLC. Chad Brown, Mike Ely, and PIAL also adopted Citizens' motion and filed their own submissions.

[2] The Coastal Plan offers coverage in Zone 5, south of the Intercoastal Waterway, the most hurricane-vulnerable area. The Fair Plan offers coverage in the rest of the state.

of last resort, these plans do not offer premiums competitive with the private market. The enabling legislation requires Citizens' rates to be actuarially sound and at least 10 percent higher than average rates charged by other insurers in the relevant market. See La. R.S. 22:1430.12.

The second source of funding is "regular assessments" that may be levied against all private insurers doing business in Louisiana, to cover any shortfall between revenues and exposure. See La. R.S. 22:1430.6, 16. Insurers are permitted, but are not required, to recoup these assessments by surcharging their policyholders. When Citizens makes a regular assessment, it imposes a commensurate "market equalization charge" on Citizens' own policyholders to maintain the 10 percent (or more) rate differential.

Next, if the revenue from premiums and regular assessments is not enough to cover its liabilities, Citizens' governing board can, subject to statutory requirements, resort to the third source of funding: levying "emergency assessments" for as many years as necessary to pay off a deficit.[3] Emergency assessments are charged directly to Louisiana policyholders. See La. R.S. 22:1430.6, 16.[4]

---

[3] The Department of Insurance must agree there is a need for the assessment and verify the amount and calculation. La. R.S. 22:1430.16.E and H.

[4] The aggregate amount of emergency assessments levied in any calendar year cannot be higher than 10 percent of either the amount needed to cover the original deficit, or of the aggregate statewide direct property premiums written for the previous year.

Finally, the board of directors is also permitted to borrow money from third-party lenders to cover its liabilities and, if necessary, secure these loans by assigning Citizens' right to receive proceeds from future assessments. All bonds, loans, or other financing mechanisms must be approved by the Louisiana State Bond Commission. La. R.S. 22:1430.16.I.

Two of the plaintiffs, Michael Treadway and Linda Gentry, are insured by Citizens. They allege in their RICO complaint that they were forced to incur "market equalization charges" and pay higher-than-necessary insurance premiums, between 2004 and 2007. The third plaintiff, Judith Sullivan, is insured by a non-Citizens insurer, USAA, and claims that she was forced to pay a "recoupment" to USAA as a result of a "regular assessment" that USAA paid to Citizens. In addition, all plaintiffs contend that they have, or will in the future, be forced to pay "emergency assessments" to Citizens as a result of the nearly $1 billion debt Citizens incurred to cover its insurance exposure after the 2005 hurricane season.

According to the plaintiffs, the defendants are partly to blame for these add-on assessments. Between 2004 and 2007, the plaintiffs claim, the defendants systematically wasted Citizens' dollars on self-indulgent expenses that had nothing to do with its operations, and caused the company to spend money on unnecessary professional services. These financial misdeeds, the plaintiffs contend, left Citizens with depleted resources in its time of need,

4

resulting in the assessments that anchor this lawsuit.

Plaintiffs' allegations of the defendants' misconduct generally fall into two categories. First, they claim that Terry Lisotta, and other defendants associated with Citizens, caused the company to reimburse the Property Insurance Association of Louisiana (PIAL), a legislatively-created association made up of all Louisiana property insurers, for expenses allegedly incurred on Citizens' behalf.[5] According to the plaintiffs, PIAL charged Citizens $20,771,831 for administrative services from January 1, 2004 to May 23, 2007.[6] Although the plaintiffs apparently claim that every cent of this $20 million was paid "to the detriment of Citizens and those it insured," the complaint is scant in factual support of this theory. The plaintiffs allege that, (1) as of September 26, 2007, Citizens paid PIAL $1,248,351 for equipment, even though "PIAL has not transferred ownership of these assets to Citizens"; (2) the P&C Insurance Consulting firm "was paid $192,336 for fees and expenses by PIAL from April 2004 to December 2006, with PIAL invoicing $102,062 of this amount to Citizens," even

---

[5] In establishing Citizens, the legislature did not provide for a staff, facilities, or other necessary services, and instead authorized the board of directors to hire personnel and enter into third-party service contracts as needed. In turn, Citizens hired PIAL on a cost-reimbursement basis as a "third party administrator" to provide staff, facilities, and other services. See La. R.S. 22:1430.6.

[6] PIAL collected $1,532,972 on December 31, 2004; $7,631,554 on December 31, 2005; and $11,607,305 on December 31, 2006.

though PIAL was "unable to demonstrate what the $102,062 was for"; (3) "PIAL allocated to Citizens. . . $5,901 of retainer fees paid to the Louisiana Auto Insurance Plan [LAIP], which is inexplicable as Citizens had no conceivable relationship with LAIP"; and (4) PIAL invoiced Citizens for the cost of group hunting and fishing trips taken by P&C Consultants, board members of PIAL and Citizens, and other individuals from state insurance agencies, in the amounts of $1,020 and $3,522. In addition, the plaintiffs assert that between August 2005 and June 2007, Citizens paid between $3.5 and $3.7 million in insurance claims-related legal expenses to lawyers who were retained without written contracts, who used "inconsistent billing practices," and who were chosen by Lisotta "based on the geographic location of the claims and on **social, professional, or commercial relationships** the firms had with him and/or Citizens' general counsel" (emphasis in the complaint).[7] The plaintiffs further submit that, even to the extent some defendants were not directly involved in this misconduct, each defendant was, at minimum, "in the position of being able to stop the actions of Lisotta. . . but took no steps to do so."

With respect to the second category of misconduct, the plaintiffs claim that between approximately August 2005 and June

---

[7] The plaintiffs also allege that, "[b]onuses totally $180,299 were paid by PIAL to senior management and other employees"; there is, however, no allegation that PIAL ever charged these bonuses to Citizens.

2007, Lisotta submitted fraudulent expense reports to both Citizens and PIAL and was reimbursed for thousands of dollars of business expenses that were unrelated to his duties as CEO. The plaintiffs charge that Lisotta: (1) charged $1,219.75 "to his LAIP credit card" in February 2004 for his wife's airfare to Bermuda, where Lisotta was conducting company business, and there is "no record of Mr. Lisotta reimbursing LAIP";[8] (2) charged $1,716.56 on his LAIP credit card for hotel rooms during Mardi Gras in February 2005, and submitted a separate expense report seeking cash reimbursement of $914.77 for a hotel room during the same time period;[9] (3) spent money on "expensive cigar purchases, other airline tickets for Mr. Lisotta's daughters, LSU football season tickets, an LSU parking pass, $1,723 for the purchase of 'golf merchandise,' purchase of golf games."[10] In total, the plaintiffs submit that "of Mr. Lisotta's expenditures examined, $25,702.00 appears to be expenses

---

[8] The plaintiffs do not explain the connection between Lisotta's charging expenses to his "LAIP credit card" and the allegations at issue in this lawsuit. These allegations appear to be somewhat at odds with the plaintiffs' assertion elsewhere in the pleadings that Citizens "had no conceivable relationship with LAIP." If the latter is correct, the Court is at a loss to understand how Lisotta's charging rooms to LAIP (however wrongful) is relevant to the plaintiffs' theory that he defrauded Citizens.

[9] The complaint is silent as to whom the second expense report was submitted.

[10] Once again, the pleadings fail to specify whether these invoices were actually paid and, if so, whether they were paid by Citizens, PIAL, or, for that matter, charged to Lisotta's LAIP credit card.

that Mr. Lisotta either did not incur, were personal in nature, or did not have a legitimate public purpose."

Plaintiffs urge that this wrongdoing constitutes "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," see Sedima, S.P.R.L. v. Imrex Co. Inc., 473 U.S. 479, 496 (1985), in violation of § 1962(c) of the RICO statute. Specifically, they contend that the defendants' acts amounted to mail fraud, wire fraud, and money laundering--each offense being a "predicate act" to satisfy the "racketeering activity" requirement of a civil RICO claim. The defendants now move to dismiss, because the plaintiffs lack standing and, further, have not sufficiently alleged the statutory elements of a RICO violation: namely, the existence of an "enterprise" or a "pattern of racketeering activity."

I.

When evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiff. Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1572 (5th Cir. 1988). The Court cannot dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff cannot prove a plausible set of facts in support of his claim which would entitle him to relief. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1974, 167

8

L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Twombly</u>, 127 S.Ct. at 1965 (internal citations omitted).

## II.

RICO's private right of action is contained in 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor. . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Section 1962 contains RICO's criminal prohibitions. Pertinent here is § 1962(c), which makes it "unlawful for any person employed by or associated with" an enterprise engaged in or affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The term "racketeering activity" is defined to include a host of so-called predicate acts, including "any act which is indictable under. . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud). . . section 1956 (relating to the laundering of monetary instruments)," <u>see</u> § 1961(1)(B), which are the three predicate acts alleged in the plaintiffs' complaint.

"The upshot," the Supreme Court recently wrote, "is that RICO

provides a private right of action for treble damages to any person injured in his business or property *by reason of* the conduct of a qualifying enterprise's affairs through a pattern of acts" that are indictable as, among other things, mail fraud, wire fraud, or money laundering. Bridge v. Phoenix Bond & Indemnity Co., 128 S. Ct. 2131, 2137-38 (2008) (emphasis added). To establish that their harm was "by reason of" the RICO violation, plaintiffs must show that the defendants' RICO violation proximately caused their injury. Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992); Sedima, 473 U.S. 479, 496, (1985). "Proximate causation" poses a set of questions to ask, rather than a formula that may be applied algorithmically. Phoenix Bond & Indemnity Co. v. Bridge, 477 F.3d 928, 930 (7th. Cir. 2007), citing Holmes, 503 U.S. at 268-70. Courts have observed that such questions include, "[i]s someone else a distinctly better enforcer? Does the presence of intermediate parties make it too hard to calculate damages--or create a risk that recovery by this plaintiff will come at the expense of someone with a better claim? If so, then suit by the remotely injured person should not be allowed." See id., aff'd, Bridge, 128 S. Ct. 2131. Proximate causation requires a showing of "some direct relation between the injury asserted and the injurious conduct alleged." Sedima, 473 U.S. at 496. In Holmes, the Supreme Court applied the proximate cause requirement to preclude a RICO suit by a plaintiff whose injury was entirely contingent on the

10

injury of direct victims. Id. at 271-74.[11] In Anza v. Ideal Steel Supply Corp, 547 U.S. 451, 126 S. Ct. 1991 (2006), the Supreme Court considered the district court's grant of a Rule 12 motion to dismiss in a case in which the RICO plaintiffs were business rivals of a group of retailers that allegedly cheated on their taxes. The theory of causation was that, by not paying sales taxes, defendants reduced their costs of doing business, and could cut their retail price commensurately; as a result, the defendants had an unfair advantage and took business (and profits) away from the plaintiffs. In holding that the plaintiffs lacked standing, the Court clarified that the Holmes proximate cause requirement not only bars RICO suits by derivative victims (those whose injuries are "purely contingent on the harm suffered by" direct victims), but generally precludes recovery by those whose injuries are only tenuously related to the RICO violation at issue. 126 S.Ct. at 1996. Under Anza, courts must scrutinize the causal link between the RICO

---

[11] The three policy rationales for the proximate cause requirement discussed by the Holmes Court were: (i) "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors;" (ii) "quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries;" and (iii) "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."

violation and the injury, identifying with precision both the nature of the violation and the cause of the injury to the plaintiff. See id. at 1996-98. If the violation is not itself the immediate cause of the plaintiff's injury, proximate cause may be lacking. The Court emphasized the reasons for the requirement that the plaintiff's harm directly result from the alleged RICO violation. Id. (citing Holmes, 503 U.S. at 269-270).

First, the Court noted "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." Id. The Court felt it significant that the attenuated causal chain between the defendant's tax fraud and the plaintiff's loss of sales was apparent. It noted the difficulty of determining whether the defendant's lower prices were in fact based on the defendant's fraudulent failure to pay sales tax, or whether other causes were present that determined the defendant's pricing. Id. The Court also pointed out that the plaintiff's lost sales could have resulted from a host of factors other than a competitor's fraud. Id.

Second, and on a related note, the Court discussed "the speculative nature of the proceedings that would follow if [plaintiff] were permitted to maintain its claim." Id. at 1998. A court would have to determine the portion of plaintiff's damages resulting from the RICO violation, by evaluating the relative causal role of the defendant's fraud in lowering the defendant's

12

prices, and the relative causal role of those lowered prices in diminishing plaintiff's sales--in effect, requiring a complex apportionment of fault among various causes. Id. The proximate causation requirement "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." Id.

Finally, the Court felt it important to consider whether "the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." Id. Because a more immediate victim (the State of New York) could be expected to pursue its own remedies for the fraud practiced upon it by the defendant, the Court found "no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly."

Under Anza, then, this Court's task is to determine whether the plaintiffs meet the high court's proximate cause expectations by examining "whether the alleged violation led directly to the [their] injuries." Id.[12] The RICO violation, according to the complaint, is the defendants' scheme to cause Citizens or PIAL to pay for services or expenses that were unnecessary, unjustified,

---

[12] At the motion to dismiss stage, the Court presumes that the "general allegations" in the complaint "embrace those specific facts. . . necessary to support the claim." Nat'l Org. for Women v. Scheidler, 510 U.S. 249, 256 (1994). Anza itself, however, dealt with the adequacy of the proximate cause allegations, and the Court did not allow the RICO plaintiffs to continue with their case in an attempt to prove an entirely remote causal link. 126 S.Ct. at 1994.

or, in some cases, proscribed by state law,[13] which included violations of federal mail fraud, wire fraud, and money laundering statutes. The alleged injury is the plaintiffs' "increased insurance costs, failure to have their Citizens' insurance claims paid timely, conversion of funds and 'special benefits' received by defendants, but paid for out of Citizens' funds, and being cast as the surety for 989 million dollars in bonds which [plaintiffs] will have to pay for until 2027, [all] due to the wrongful acts of the defendants."

Applying the proximate cause analysis in Anza, the Court concludes that the plaintiffs have fallen into the remote-causal connection trap, and failed to allege their injury was proximately caused by defendants' RICO violations. To begin, the Court points out that the complaint provides very little factual information about the timing of the assessments and makes almost no attempt whatsoever to actually link these assessments to funding deficits that may have been caused by the defendants' misconduct. The drama of plaintiffs' charges is simply not enough. Their implicit theory of proximate cause is that, if the corporate dollars wasted by the

---

[13] The complaint includes an allegation that Caryl Mathes, former chief operating officer of Citizens and "willing participant in the scheme," received $47,850 in severance pay, and that "[b]onuses, totally $180,299 were paid by PIAL to senior management and other employees," all in violation of the Louisiana Constitution. The Court notes that the pleadings provide no information about whether these payments were charged to Citizens. The plaintiffs also complain that defendants' breached fiduciary duties under state law.

defendants had instead been used to fund the FAIR and Costal Plans, Citizens would have been able to levy smaller assessments against the plaintiffs. But the allegations provide little information about when these charges occurred, how much they were, whether they were based on financial deficits that came into existence before or after the RICO violations.[14]

As to the first <u>Anza</u> consideration, the asserted causal chain is patently attenuated. It would be nearly impossible to determine what effect, if any, the defendants' misconduct had on Citizens' decision to impose an assessment, or the amount, compared to a number of other possible factors. The most significant catalyst for the assessment was, quite obviously, funding deficits brought about by insurance claims following Hurricanes Katrina and Rita. It strains reason to imagine that financial losses caused by the alleged acts of mail fraud, wire fraud, and money laundering--however blameworthy and disreputable--materially influenced

---

[14] By implication, the plaintiffs suggest that a regular assessment was levied against all non-Citizens insurers sometime prior to July 1, 2006, because on that the date "Citizens levied a 15 percent 'market equalization charge' on its own policy holders." Under 1430:16(f), a market equalization charge is permitted only after a "regular assessment." Plaintiffs aver that the market equalization charge ended on June 30, 2007, and raised some "$30,375,000 for Citizens, yet Citizens still had to borrow $978,205,000 through bonds to cover its deficits"; Citizens secured the loan by "pledg[ing] the proceeds of future emergency assessments to repay bondholders." This suggests that the loan was taken after June 30, 2007. Earlier in the complaint, the plaintiffs represent that the sale of nearly $1 billion in bonds was "arranged for" in April 2006.

Citizens' decision to take out a nearly $1 billion loan.[15] Likewise, it would be complex in the extreme to calculate whether the defendants' deeds affected FAIR or Coastal Plan premiums. These rates are primarily a consequence of the rates being charged by the industry at large (plus 10 percent).

Second, the proceedings required to evaluate the plaintiffs' injury would be unacceptably speculative, as Anza instructs. As the complaint acknowledges, there exists very little, if any, documentation regarding some of Citizens' payments to PIAL, law firms, and others. But to determine whether the plaintiffs were injured, and by how much, the Court would first be required to determine, for example, how much of the alleged $3.5 - $3.7 million in legal fees, the $20 million paid to PIAL between 2004 and 2007, the consultant's fees, and many of the other expenses were, in fact, fraudulent. This equates with limitless speculation and uncertainty.[16] The Court would also be faced with the possibility of having to consider what factors went into USAA's (or other non-Citizens insurers) decision to "recoup" regular assessments from

---

[15] The Court also considers relevant the fact that Citizens' has no authority to unilaterally impose or set the amount of an emergency assessment. Rather, the board's power is subject to statutory oversight. La. R.S. 22:1430.16.E and H.

[16] Lack of clarity of the complaint also presents an obstacle to evaluating the plaintiffs' injury. In many cases, the complaint provides no information about whether the fraudulent costs were charged to Citizens or PIAL.

their policyholders. And, finally, the Court would need to ultimately decide what portion of the costs incurred by plaintiffs could reasonably be attributed to the RICO violations, as opposed to other factors. This would be an "intricate, uncertain" inquiry of the type that the Anza Court assertively warned against. Id.

Given the substantial shortcomings of the complaint in meeting Anza's proximate cause requirements, the Court does not need to determine whether more immediate victims of the defendants' alleged RICO violations are likely to sue.[17] The Court does note, however, that a lawsuit brought by Citizens or PIAL against the alleged wrongdoers would present a much less difficult case for proximate causation. Although the plaintiffs' allegations are insufficient as a matter of law to continue with this lawsuit, it bears emphasizing that the defendants have not escaped condemnation. Michael Treadway, Linda Gentry, and Judith Sullivan are simply not the proper plaintiffs, and RICO is not the proper civil instrument, to redress these alleged acts of illegality.

Because the plaintiffs cannot show that their claimed injuries were proximately caused by the defendants' conduct, the plaintiffs lack statutory standing to pursue their federal RICO claims. The

---

[17] The likelihood of more direct victims bringing suit was not essential to a finding of no proximate cause in Anza. See 126 S.Ct. at 1998 (noting that "[t]he requirement of a direct causal connection is especially warranted where the immediate victim of an alleged RICO violation can be expected to vindicate the laws by pressing their own claims") (emphasis added).

defendants' motion to dismiss is, therefore, GRANTED.[18]

New Orleans, Louisiana, August 15, 2008.

```
_____
         MARTIN L. C. FELDMAN
       UNITED STATES DISTRICT JUDGE
```

---

[18]Because the Court agrees the plaintiffs lack standing, the defendants' other grounds for dismissal need not be considered.